No. 24-5040

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL KING
and DEBORAH KING,
*Plaintiffs-Appellants,*

v.

DEPUY OTHOPAEDICS, INC.,
DEPUY PRODUCTS, INC.,
DEPUY SYNTHES, INC.,
JOHNSON & JOHNSON,
JOHNSON & JOHNSON SERVICES, INC.,
and JOHNSON & JOHNSON INTERNATIONAL,
*Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
No. 2:23-cv-00196
Hon. Susan M. Brnovich

## APPELLANTS' OPENING BRIEF

SCHLESINGER LAW OFFICES, P.A.

**Jeffrey L. Haberman**
jhaberman@schlesingerlaw.com
**Sarah J. Foster**
sarah@schlesingerlaw.com
1212 Southeast Third Avenue
Fort Lauderdale, Florida 33316
(954) 467-8800

CREED & GOWDY, P.A.

**Bryan S. Gowdy**
bgowdy@appellate-firm.com
filings@appellate-firm.com
**Dimitrios A. Peteves**
dpeteves@appellate-firm.com
865 May Street
Jacksonville, Florida 32204
(904) 350-0075

*Counsel for Appellants, Michael King and Deborah King*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument. The district court instructed the jury that "[t]here was an effort to withhold . . . from Defendant and the jury" the compensation paid to one of Plaintiffs' non-retained experts, Dr. Mullen. 1-ER-26. The court further instructed the jury that "[t]he excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." 1-ER-26.

Oral argument will assist this Court in understanding that the district court erred in giving this instruction. To begin, the district court's instruction was not authorized by the rules of procedure or the court's inherent powers. Even if it were authorized, there was not an effort to withhold Dr. Mullen's compensation. Further, as a matter of law, the payments were not "undisclosed," and it was for the jury to decide if they were "excessive." In any event, as a matter of fact, the payments were not excessive. The court also abused its discretion by singling out Dr. Mullen.

i

# TABLE OF CONTENTS

Statement regarding oral argument.................................................i

Table of contents.......................................................................ii

Table of authorities ................................................................iv

Introduction ............................................................................1

Jurisdictional statement ...........................................................5

Issue presented .......................................................................8

Statement of the case ..............................................................9

    A.    Plaintiffs sue DePuy for claims concerning its metal-on-metal hip. ......................................................................9

    B.    Plaintiffs disclose Dr. Mullen as a non-retained expert. ...........9

    C.    DePuy serves 57 requests for production. .................................10

    D.    Dr. Mullen testifies at deposition. ...........................................11

    E.    Plaintiffs respond to DePuy's requests for production, and DePuy takes no action to compel discovery of how much Plaintiffs were paying Dr. Mullen. ............................................12

    F.    Dr. Mullen testifies at trial. ....................................................13

    G.    The district court gives a purported "curative" instruction that tarnishes Plaintiffs and Dr. Mullen...................................17

    H.    DePuy capitalizes on the "curative" instruction during closing arguments.......................................................................25

    I.    The jury returns a verdict for DePuy on all counts. .................27

    J.    The district court sanctions Plaintiffs' counsel. ........................27

Summary of argument ............................................................29

Standards of review................................................................30

Argument ................................................................................................ 31

I.  The district court erred by instructing the jury that
    "[t]here was an effort to withhold Dr. Mullen's
    compensation from Defendant and the jury." ........................... 31

    A.  As a matter of law, the instruction was not
        authorized. ........................................................................ 31

        1.  The instruction was not authorized under the
            rules of procedure ..................................................... 31

        2.  The instruction was not authorized under the
            district court's inherent powers ............................... 40

    B.  There was not an effort to withhold Dr. Mullen's
        compensation. .................................................................... 44

        1.  As a matter of law, Plaintiffs did not have a
            duty to disclose Dr. Mullen's compensation. ........... 45

        2.  As a matter of fact, counsel's comment was not
            an effort to withhold Dr. Mullen's compensation ... 49

II. The district court erred by instructing the jury that "[t]he
    excessive and undisclosed payments to Dr. Mullen may
    have affected the credibility of his testimony." ........................ 51

    A.  As a matter of law, the payments to Dr. Mullen were
        not "undisclosed," and it was for the jury to decide if
        they were "excessive." ....................................................... 51

    B.  As a matter of fact, the payments to Dr. Mullen were
        not "excessive." .................................................................. 54

    C.  The district court abused its discretion by singling
        out Dr. Mullen. ................................................................. 57

III. DePuy cannot prove harmless error. ......................................... 59

Conclusion ............................................................................................ 62

iii

# TABLE OF AUTHORITIES

<u>C<span>ASES</span></u>

*Am. United for Kids v. Rousseau*,
  985 F.3d 1075 (9th Cir. 2021) .......................................................42–43

*Apotex Corp. v. Merck & Co.*,
  229 F.R.D. 142 (N.D. Ill. 2005) ............................................................ 46

*Baldwin v. Sec'y, Fla. Dep't of Corrs.*,
  No. 16–17101–B, 2017 WL 5665448 (11th Cir. 2017) ........................ 41

*Bowers v. NCAA*,
  475 F.3d 524 (3d Cir. 2007) ................................................................. 36

*Chinaryan v. City of Los Angeles*,
  113 F.4th 888 (9th Cir. 2024) ..................................................30, 59–60

*Conklin v. Medtronic, Inc.*,
  431 P.3d 571 (Ariz. 2018)...................................................................... 10

*Davis v. Miller*,
  571 F.3d 1058 (10th Cir. 2009)............................................................. 42

*Env'l World Watch v. Walt Disney*,
  630 F. App'x 687 (9th Cir. 2015) .......................................................... 43

*Goodman v. Staples the Office Superstore, LLC*,
  644 F.3d 817 (9th Cir. 2011)..................................................19–20, 34

*Gregory v. Montana*,
  118 F.4th 1069 (9th Cir. 2024) ............................................................. 30

*Hall v. Sykes*,
  164 F.R.D. 46 (E.D. Va. 1995) ........................................................18, 38

*Haslett v. Tex. Indus., Inc.*,
  No. 397–CV–2901D, 1999 WL 354227 (N.D. Tex. May 20, 1999)........38, 55

*Hillis v. Heineman*,
  626 F.3d 1014 (9th Cir. 2010).........................................................34–35

iv

*In Re Crim. Investigation No. 1/296X*,
  646 A. 2d 389 (Md. Ct. App. 1994) ...................................... 37

*Jewell v. Life Ins. of N. Am.*,
  508 F.3d 1303 (10th Cir. 2007) .......................................... 52

*Jones v. Riot Hospitality Group LLC*,
  95 F.4th 730 (9th Cir. 2024) .............................................. 30

*Lamere v. N.Y. State Office for the Aging*,
  223 F.R.D. 85 (N.D.N.Y. 2004) .......................................... 38

*Liberty Ins. Corp. v. Brodeur*,
  41 F. 4th 1185 (9th Cir. 2022) ........................................... 39

*Maheu v. Hughes Tool Co.*,
  569 F.2d 459 (9th Cir. 1977) ........................................ 58–59

*Miranda v. S. Pac. Transp. Co.*,
  710 F.2d 516 (9th Cir. 1983) ........................................ 41–42

*Nationwide Biweekly Admin., Inc. v. Owen*,
  873 F.3d 716 (9th Cir. 2017) .............................................. 49

*Navellier v. Sletten*,
  262 F.3d 923 (9th Cir. 2001) ....................................... 53, 57

*Prasad v. MML Invs. Servs., Inc.*,
  No. 04 Civ. 380, 2004 WL 1151735 (S.D.N.Y. May 24, 2004) ............ 55

*Pumphrey v. K.W. Thompson Tool Co.*,
  62 F.3d 1128 (9th Cir. 1995) .............................................. 41

*Quercia v. United States*,
  289 U.S. 466 (1933) .................................................. 53–54

*S.E.C. v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ............................................ 52

*Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*,
  272 F.R.D. 350 (W.D.N.Y. 2011) ......................................... 36

*Unigard Sec. Ins. v. Lakewood Eng'g Mfg. Corp.*,
 982 F.2d 363 (9th Cir. 1992)........................................................32, 40

*United States v. Biddix*,
 No. 8:14-cr-140, 2015 WL 9473949 (M.D. Fla. Dec. 29, 2015)......51–52

*United States v. Handy*,
 454 F.2d 885 (9th Cir. 1971).................................................................52

*United States v. Randall*,
 162 F.3d 557 (9th Cir. 1998).................................................................41

*United States v. Valencia-Lopez*,
 971 F.3d 891 (9th Cir. 2020).................................................................60

*United States v. Watkins*,
 278 F.3d 961 (9th Cir. 2002).................................................................34

*Watson v. City of Henderson*,
 No. 2:20-cv-01761, 2024 WL 1514983 (D. Nev. Apr. 5, 2024)............48

## STATUTES

18 U.S.C. § 201..................................................................................18, 54

28 U.S.C. § 1291.......................................................................................6

28 U.S.C. § 1332(a) ..................................................................................5

28 U.S.C. § 1332(c)(1) ...........................................................................5–6

## RULES

Fed. R. App. P. 4(a)(1)(A) .........................................................................7

Fed. R. Civ. P. 26(a) ....................................................................... passim

Fed. R. Civ. P. 26(a)(2)(B) .................................................1, 9, 18, 33–34

Fed. R. Civ. P. 26(a)(2)(B)(vi) .......................................................9–10, 33

Fed. R. Civ. P. 26(a)(2)(C) .................................................1, 9, 10, 33–34

Fed. R. Civ. P. 26(e) ........................................................................35–36

Fed. R. Civ. P. 26(e)(1) ...............................................................35

Fed. R. Civ. P. 26(e)(1)(A) ........................................................35–36

Fed. R. Civ. P. 26(f) ....................................................................40

Fed. R. Civ. P. 37(a) ....................................................................32

Fed. R. Civ. P. 37(a)(5)(A) ........................................................32

Fed. R. Civ. P. 37(b) ....................................................................32

Fed. R. Civ. P. 37(b)(2) ...............................................................32

Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi) ............................................39

Fed. R. Civ. P. 37(c)(1) ...............................................................32, 39

Fed. R. Civ. P. 37(c)(1)(B) ........................................................32–33

Fed. R. Civ. P. 37(d) ....................................................................39

Fed. R. Civ. P. 37(d)(1)(A)(i)–(ii) ............................................39

Fed. R. Civ. P. 37(d)(3) ...............................................................39

Fed. R. Civ. P. 37(e) ....................................................................39

Fed. R. Civ. P. 37(f) .....................................................................40

## OTHER AUTHORITIES

American Bar Association (ABA),
*Model Rules of Professional Conduct: Preamble & Scope* ...................46

American Medical Association (AMA),
*AMA-ABA Statement on Interprofessional Relations for Physicians and Attorneys H-265.997* (2018) ..........................................................38

Banner Health,
*About Banner Health*, https://www.bannerhealth.com/about ..............15

Black's Law Dictionar*y*,
    *Communication* (12th ed. 2024) ........................................................ 37

Charles A. Wright et al.,
    *Federal Practice and Procedure* (3d ed. June 2024 update) ................ 36–37

Jeffrey S. Kinsler & Gary S. Colton, Jr.,
    *Compensating Fact Witnesses*, 184 F.R.D. 425 (1999) ........................ 56

John Henry Wigmore,
    *A Treatise on the Anglo-American System of Evidence in Trials at*
    *Common Law* (2d ed. 1923) .................................................................. 45

Michael L. Forte & Sara M. Klco
    *Must Treating Physicians Be Paid for Their Testimony?*, 32 Trial
    Advoc. Q. 25 (2013) .............................................................................. 38

Ninth Circuit Model Civil Jury Instruction 1.14 ................. 52–53, 57–58

Restatement (Third) of the Law Governing Lawyers (2000) ................. 46

## INTRODUCTION

Plaintiff Michael King was implanted with a metal-on-metal hip made by DePuy. 3-ER-397–98. Four years later, he underwent surgery to have the hip replaced with a non-metal hip due to elevated metal ion levels, increasing hip pain from metallosis, and a buildup of inflammatory fluid. *See* 3-ER-398; 2-ER-141–43. Mr. King and his wife sued DePuy for products liability and other claims. 4-ER-516.

Dr. Daniel Mullen was the treating orthopedic surgeon who put DePuy's metal-on-metal implant into Mr. King's left hip. 3-ER-398. When Mr. King needed to have his right hip replaced a year later, Dr. Mullen used a hip with a plastic liner because he thought that the benefits of metal-on-metal hips did not outweigh their risks. 3-ER-398; 3-ER-491. Plaintiffs disclosed Dr. Mullen as a non-retained expert witness. 2-ER-210.

At trial—and outside the presence of the jury—DePuy argued that Dr. Mullen could not testify about his risk-benefit analysis because it would be "improper undisclosed expert testimony." 3-ER-245. Yet, rule 26 does not require disclosure of written reports for non-retained experts. Fed. R. Civ. P. 26(a)(2)(B)–(C). Plaintiffs' counsel therefore

1

explained: "Dr. Mullen is a treating physician. Treating physicians are hybrid experts. They're nonretained. No one is paying him for his testimony. He's not a retained expert witness. He's a nonretained expert witness." 3-ER-247. The jury did not hear these comments. 3-ER-233; 3-ER-249. The trial court sustained DePuy's objection, explaining: "I'm limiting the question of defect to the expert and not the fact witness." 3-ER-247–48.

Dr. Mullen then testified in front of the jury. On cross-examination, Dr. Mullen said that Plaintiffs' counsel was compensating him for his "time here today." 3-ER-360. Dr. Mullen explained that he has a "fee schedule for a day in the courtroom" because appearing in court requires him to cancel surgeries and patient consults. 3-ER-364. His standard fee to appear at trial is $20,000, but he agreed to discount his fee to $15,000 because he expected to finish testifying by 11:00 am. 3-ER-360–61. Dr. Mullen's fee was commensurate with the fee charged by DePuy's expert orthopedic surgeon, who charged $12,125.00 a day to testify at trial. 2-ER-197; 2-ER-219.

DePuy moved for a "curative" jury instruction, arguing that the payment was "unreasonable" for a non-retained witness. 3-ER-383.

DePuy also claimed that Plaintiffs made "an effort to mislead [DePuy] and the jury into believing that Dr. Mullen is an unbiased percipient witness." 3-ER-384. The district court agreed, faulting Plaintiffs for not disclosing Dr. Mullen's compensation—even though Plaintiffs were not required to disclose it. 1-ER-47; 1-ER-52–3. The court also focused on Plaintiffs' counsel comment that "No one is paying [Dr. Mullen] for his testimony"—even though the comment was made outside the presence of the jury and thus did not require a curative jury instruction. *See* 1-ER-52–53.

The court instructed the jury: "In assessing the veracity of Dr. Mullen's testimony, the jury should consider that: (1) There was an effort to withhold Dr. Mullen's compensation from Defendant and the jury; and (2) The excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." 1-ER-26. DePuy capitalized on the instruction by emphasizing it during closing arguments. 2-ER-98–101.

Unsurprisingly, after Plaintiffs and Dr. Mullen were tarnished by the court, the jury rendered a verdict for DePuy on all claims. Plaintiffs appeal from the final judgment on the jury's verdict.

3

This Court should reverse and remand for a new trial. The district court's instruction that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury" was not authorized by the rules of procedure or the court's inherent powers. Even if it were authorized, there was not an effort to withhold Dr. Mullen's compensation. Further, as a matter of law, the payments were not "undisclosed," and it was for the jury to decide if they were "excessive." In any event, as a matter of fact, the payments were not excessive. The court also abused its discretion by singling out Dr. Mullen.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there was complete diversity of citizenship between Plaintiffs and Defendants and the amount in controversy exceeded $75,000. The citizenships of the parties were as follows:

- Plaintiff Michael King was a citizen of Texas. 4-ER-516.

- Plaintiff Deborah King was a citizen of Texas. 4-ER-516.

- Defendant DePuy Orthopaedics, Inc. was a corporation incorporated in Indiana with its principal place of business in Indiana; accordingly, it was a citizen of Indiana. 4-ER-517; 28 U.S.C. § 1332(c)(1).

- Defendant DePuy Products, Inc. was a corporation incorporated in Indiana with its principal place of business in Indiana; accordingly, it was a citizen of Indiana. 4-ER-517; 28 U.S.C. § 1332(c)(1).

- Defendant DePuy Synthes, Inc. was a corporation incorporated in Delaware with its principal place of business in Indiana; accordingly, it was a citizen of Delaware and Indiana. 4-ER-517; 28 U.S.C. § 1332(c)(1).

5

- Defendant Johnson & Johnson was a corporation incorporated in New Jersey with its principal place of business in New Jersey; accordingly, it was a citizen of New Jersey. 4-ER-517; 28 U.S.C. § 1332(c)(1).

- Defendant Johnson & Johnson Services, Inc. was a corporation incorporated in New Jersey with its principal place of business in New Jersey; accordingly, it was a citizen of New Jersey. 4-ER-517–18; 28 U.S.C. § 1332(c)(1).

- Defendant Johnson & Johnson International was a corporation incorporated in New Jersey with its principal place of business in New Jersey; accordingly, it was a citizen of New Jersey. 4-ER-518; 28 U.S.C. § 1332(c)(1).

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final decision of a district court.

The clerk entered final judgment, which disposed of all parties' claims. 1-ER-4. The judgment was amended twice to correct typographical errors. *See* 1-ER-2–3. The original judgment, amended judgment, and second amended judgment were all entered on July 25, 2024.

6

On August 14, 2024, Plaintiffs filed their notice of appeal from the second amended final judgment. 2-ER-74.

Plaintiffs' notice of appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it was filed within 30 days of the second amended final judgment (as well as the original final judgment).

## ISSUE PRESENTED

The district court instructed the jury that "[t]here was an effort to withhold . . . from Defendant and the jury" the compensation paid to one of Plaintiffs' non-retained experts, Dr. Mullen. The court further instructed the jury that "[t]he excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony."

In giving this instruction, the court sought to "cure" a comment made by Plaintiffs' counsel *outside the presence of the jury*. The court also sought to sanction Plaintiffs for not disclosing the compensation— even though Plaintiffs were not required to disclose it.

Should this Court reverse and remand for a new trial due to the district court's instruction?

## STATEMENT OF THE CASE

### A.  Plaintiffs sue DePuy for claims concerning its metal-on-metal hip.

Plaintiffs, Michael King and his wife Deborah King, sued DePuy Orthopaedics, Inc. for claims concerning a metal-on-metal hip made by DePuy. 4-ER-516. Mr. King raised claims for negligence, design defect, and failure to warn. 4-ER-530–49. Mrs. King raised a claim for loss of consortium. 4-ER-549–50. The case was originally part of a multi-district litigation and was later transferred to the Northern District of Arizona for individual consideration. Doc. 41.

### B.  Plaintiffs disclose Dr. Mullen as a non-retained expert.

On October 28, 2022, Plaintiffs served an expert-witness disclosure under Federal Rule of Civil Procedure 26(a)(2). 2-ER-200–11. Rule 26(a)(2) distinguishes between two types of experts: (i) an expert "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony"—i.e., a retained expert; and (ii) all other experts—i.e., non-retained experts. Fed. R. Civ. P. 26(a)(2)(B)–(C).

For retained experts, rule 26(a)(2) specifically requires a party to disclose the expert's written report, including "a statement of the

9

compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi). There is no such requirement for non-retained experts. Instead, for a non-retained expert, a party must merely disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

In their rule 26(a)(2) disclosure, Plaintiffs disclosed fifteen retained experts and seven non-retained experts. 2-ER-200–10. One of the non-retained experts was Dr. Daniel Mullen, the orthopedic surgeon who implanted DePuy's metal-on-metal hip into Mr. King. 2-ER-210. Dr. Mullen was an important witness because, under Arizona's learned-intermediary doctrine, DePuy's duty to warn ran to him.[1] *See Conklin v. Medtronic, Inc.*, 431 P.3d 571, 577 (Ariz. 2018).

## C. DePuy serves 57 requests for production.

On November 4, 2022, DePuy served 57 requests for production on Plaintiffs. Request 43 asked for "[a]ny and all copies of all forms of

---

[1] It was undisputed that the substantive law of Arizona controlled. *See* 3-ER-399; 3-ER-427. It was also undisputed that the learned-intermediary doctrine applied to the failure-to-warn claim. *See* 2-ER-129; 3-ER-453–54.

10

*communication* between Plaintiff and/or Plaintiff's attorney(s) and Plaintiff's orthopaedic surgeons." *See* 2-ER-176 (emphasis added). Similarly, request 44 asked for "[a]ny and all documents evidencing *communications* between Plaintiff and any expert on behalf of Plaintiff." 2-ER-176 (emphasis added). Neither of these requests—or any other request—specifically asked about payments to experts. 2-ER-160–80.

## D.  Dr. Mullen testifies at deposition.

On November 18, 2022, DePuy deposed Dr. Mullen. 3-ER-472. When asked by DePuy if he had spoken with Plaintiffs' counsel before the deposition, Dr. Mullen said he had a call with Plaintiffs' counsel. 3-ER-476 (at 12:11–20). DePuy explicitly asked Dr. Mullen if Plaintiffs had paid him and if he expected to be paid by Plaintiffs for his time. 3-ER-477 (at 14:8–17). Dr. Mullen explicitly confirmed that he did expect Plaintiffs to pay him, but DePuy did not follow up and ask Dr. Mullen *how much* he expected to be paid:

> Q. Have you received any monetary compensation for consulting fees or otherwise from anyone who represents plaintiffs in this case?

> A. I had asked to be paid for the phone call. We have a phone call fee. I have -- I have not been paid, but I took the phone call anyway.

11

Q. But you're expecting to be paid for that time?

A. I hope so. You never trust these lawyers. You never know.

3-ER-477 (at 14:8–17).

## E. Plaintiffs respond to DePuy's requests for production, and DePuy takes no action to compel discovery of how much Plaintiffs were paying Dr. Mullen.

In March 2023, Plaintiffs served their responses to DePuy's November 2022 requests for production. Plaintiffs served amended responses in September 2023. 2-ER-159. In their responses to requests 43 and 44—the requests for "communications" with Plaintiffs' orthopedic surgeons and experts—Plaintiffs responded: "None in Plaintiff's possession, custody, or control." 2-ER-176.

When these responses were served in March and September 2023, DePuy knew—from the November 2022 deposition of Dr. Mullen—that Dr. Mullen expected Plaintiffs to pay him for his time. 3-ER-477 (at 14:8–17). Nevertheless, DePuy never moved to compel disclosure of payments made by Plaintiffs to Dr. Mullen.

DePuy's failure to file such a motion was not because DePuy did not intend to vigorously litigate this case. To the contrary, from December 2022 to May 2024, DePuy file nine motions to limit or exclude

12

Plaintiffs' experts, one motion to compel information on Plaintiffs'

experts, and two other motions in limine (one of which was an omnibus

motion raising over 60 issues). Docs. 26, 30, 32, 60, 61, 62, 63, 64, 98,

111, 134, 172.

## F.    Dr. Mullen testifies at trial.

On July 9, 2024, the case went to a seven-day jury trial.

Dr. Mullen testified on the morning of the third day of trial.

Before Dr. Mullen testified, and outside the presence of the jury,

DePuy raised an objection concerning Dr. Mullen's deposition

testimony. 3-ER-245. Specifically, Dr. Mullen had testified at deposition

that he implanted DePuy's metal-on-metal hip into Mr. King's left hip

in 2010. 3-ER-479 (at 25:1–9). When Mr. King came back for a right-hip

replacement a year later, Dr. Mullen had stopped using metal-on-metal

hips, so he instead implanted a hip with a plastic liner. 3-ER-478–79 (at

21:6–13, 25:1–11); 3-ER-491 (at 72:5–10). Plaintiffs' counsel asked Dr.

Mullen if he ever went back to using metal-on-metal hips, and Dr.

Mullen said he had not. 3-ER-491 (at 72:21–24). Counsel then asked, "is

that because you feel that the benefits of metal-on-metal do not

13

outweigh the risks of metal-on-metal," to which Dr. Mullen responded, "I'd say that's fair, yes." 3-ER-491 (at 72:25–73:3).

DePuy argued that Dr. Mullen's deposition testimony about the benefits not outweighing the risks "is *improper undisclosed expert testimony* for a fact witness who is coming in here to talk about his implantation of this device in 2010." 3-ER-245 (emphasis added). Although DePuy did not object to Dr. Mullen testifying about the opinions he held in 2010, it objected to "any attempt to solicit *undisclosed expert testimony* about how he viewed that risk/benefit analysis later on down the road." 3-ER-245–46 (emphasis added).

Plaintiffs disagreed that it was an undisclosed expert opinion and distinguished between retained experts and non-retained treating physicians. 3-ER-246–47. In doing so, Plaintiffs' counsel said: "Dr. Mullen is a treating physician. Treating physicians are hybrid experts. They're nonretained. No one is paying him for his testimony. He's not a retained expert witness. He's a nonretained expert witness." 3-ER-246. This statement was made outside the presence of the jury. 3-ER-233; 3-ER-249.

14

The district court ultimately sustained DePuy's objection, explaining: "I'm limiting the question of defect to the expert and not the fact witness." 3-ER-247–48.

Dr. Mullen then testified in front of the jury. He explained that he is an orthopedic surgeon who has specialized in that field for almost thirty years. 3-ER-250. He does surgeries every Monday and Wednesday, the majority of which are joint replacements. 3-ER-256. Every Tuesday and Thursday he is in the office "for a full day seeing patients." 3-ER-256. On Fridays he sees patients and handles "any broken bones" or "things that can't wait, that don't fit into the typical schedule." 3-ER-256–57.

Dr. Mullen used to do most of his surgeries at Banner Baywood Hospital, where he was "the busiest orthopedic surgeon at the hospital." 3-ER-257. "There was one year . . . where the Banner executives told [him] that [he] did more joint replacements at a Banner hospital than any surgeon at any Banner hospital across the country." 3-ER-257. "Banner Health is one of the largest, nonprofit health care systems in the country." *About Banner Health*, https://www.bannerhealth.com /about [https://perma.cc/3AZ7-3ECM].

15

At the time of trial, Dr. Mullen did most of his surgeries at Oasis Hospital, which had been recently renamed to Arizona Specialty Hospital. 3-ER-257. He was "the busiest orthopedic surgeon there as well." 3-ER-257.

On cross-examination, DePuy asked Dr. Mullen if Plaintiffs' counsel was "compensating [him] for [his] time here today." 3-ER-360. Dr. Mullen explained that he has a "fee schedule for a day in the courtroom" because appearing in court requires him to cancel surgeries and patient consults. 3-ER-364. Indeed, he had to "cancel 18 patients" and reschedule their appointments to testify at Plaintiffs' trial. 3-ER-364. He said "[t]here is a lot of lost faith with patients when you have to cancel on short notice like this" and that "it makes a bit of a mess of the schedule and other people's lives." 3-ER-364.

Dr. Mullen's standard fee to appear at trial is $20,000, but he agreed to discount his fee to $15,000 because he expected to finish testifying by 11:00 am. 3-ER-360–61. He said: "I have an astronomical fee to try to dissuade people from asking me to be here." 3-ER-361.[2]

_____

[2] As Dr. Mullen later explained, he "determined the amount of [his] in-person testimony fee after [he] consulted with other surgeons." 2-ER-66.

16

Dr. Mullen testified about the unique risks of metal-on-metal hips. 3-ER-266–67; 3-ER-371–72. Notably, he explained that the human body reacts adversely to metal wear particles generated by metal-on-metal hips. 3-ER-267. He also testified about "metallosis"—a condition where a person has toxic levels of metal in their body. 3-ER-327. Dr. Mullen said he did not warn Mr. King about metallosis when he implanted DePuy's metal-on-metal hip into Mr. King because he "didn't know that metallosis was a thing back then." 3-ER-278–79.

Consistent with DePuy's objection about "undisclosed expert testimony," the district court sustained multiple objections by DePuy to questions asking Dr. Mullen about his present opinions on metal-on-metal hips or why he does not use them anymore. 3-ER-268; 3-ER-298–99; 3-ER-370–71.

On cross-examination, DePuy asked Dr. Mullen about his deposition testimony. 3-ER-325. DePuy also read portions of Dr. Mullen's deposition testimony. 3-ER-348–49; 3-ER-354.

## G.    The district court gives a purported "curative" instruction that tarnishes Plaintiffs and Dr. Mullen.

After Dr. Mullen was excused, DePuy filed a motion for a "curative" instruction. 3-ER-383. DePuy acknowledged that "lawyers

17

may . . . compensate a non-retained expert or fact witness for (1) reasonable expenses incurred by the witness to attend the trial, and (2) reasonable compensation for the loss of the witness's time in attending trial to testify." 3-ER-385. As DePuy noted, "Congress codified this common law principle at 18 U.S.C. § 201," which permits payment to witnesses for "reasonable cost of travel and subsistence incurred and the reasonable value of time lost in attendance at any such trial, hearing, or proceeding." 3-ER-385.

Nevertheless, DePuy argued that the payment to Dr. Mullen was "unreasonable." 3-ER-383–85. DePuy further faulted Plaintiffs for not disclosing the payment and claimed that Plaintiffs had made "an effort to mislead [DePuy] and the jury into believing that Dr. Mullen is an unbiased percipient witness, an end-run around the expert report requirement of Rule 26(a)(2)(B) – or both." 3-ER-384. However, by its plain text, rule 26(a)(2)(B) applies only to a witness "retained or specially employed to provide expert testimony"—and, to reiterate, Dr. Mullen was *not* a retained expert.[3] 2-ER-210.

---

[3] The fact that Dr. Mullen was paid to appear at trial did not make him a retained expert under rule 26(a)(2). It is customary to pay treating physicians for their time lost in appearing for trial. *E.g.*, *Hall v.*

DePuy also moved for disclosure of all communications between Plaintiffs' counsel and Dr. Mullen. 2-ER-149–52; 3-ER-390. DePuy noted its prior request for production of "communications" between Plaintiffs' counsel and Mr. King's orthopedic surgeons. 2-ER-149. Although the request was made more than a year and a half before trial, DePuy argued that Plaintiffs were required to supplement their prior response. 2-ER-149.

Plaintiffs' counsel explained that, at the time the request for production was served, there were no such written communications. 2-ER-150. Counsel further stated: "[a]ny communications I think, would be just about scheduling afterward." 2-ER-151. The court then asked if there were any communications about payment, and counsel said there might be communications about the logistics of payment. 2-ER-151.

The court orally granted DePuy's request for disclosure of communications and required Plaintiffs to file a written response to the

---

*Sykes*, 164 F.R.D. 46, 48 (E.D. Va. 1995) ("It is traditional that doctors are compensated for their time when required to testify."); *infra* at 38 n.4. It is only "when a treating physician morphs into a witness hired to render expert opinions that go beyond the usual scope of a treating doctor's testimony" that "the proponent of the testimony must comply with Rule 26(a)(2)." *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011).

motion for a "curative" instruction. 2-ER-144; 2-ER-153. Plaintiffs complied with the court's order and produced emails between Plaintiffs' counsel's office and Dr. Mullen's office. 2-ER-194–95.

In their written response to DePuy's motion, Plaintiffs argued that the jury could consider Dr. Mullen's compensation in weighing his testimony, but it would be improper for the court to give a special jury instruction. 2-ER-190–98. Plaintiffs noted that the $15,000 payment to Dr. Mullen was in line with DePuy's payment to its own expert orthopedic surgeon, Dr. Steven Barrington. 2-ER-197. Indeed, Dr. Barrington's rate for testifying at trial was $12,125.00 per day—just $2,875 less than Plaintiffs' payment to Dr. Mullen. 2-ER-197; 2-ER-219.

Plaintiffs also emphasized that Dr. Mullen's compensation was not withheld; rather, Dr. Mullen testified about it to the jury. 2-ER-194. Plaintiffs rejected DePuy's contention that they had violated rule 26 by not disclosing the compensation. 2-ER-193. Plaintiffs explained that a treating physician "is not subject to the written report requirement" unless the physician testifies about opinions formed outside the course of treatment, which Dr. Mullen did not do. 2-ER-193 (quoting *Goodman*, 644 F.3d at 824).

20

DePuy filed a reply. 2-ER-155. DePuy claimed it was "deprived of the[] opportunity" to cross-examine Dr. Mullen about the fact that Plaintiffs' counsel paid him $500 for the phone call before his deposition. 2-ER-157. DePuy claimed to be deprived of that opportunity even though (a) DePuy had known about the payment (but not the amount) since the deposition—which happened over a year and a half before trial; and (b) DePuy never moved to compel Plaintiffs to disclose the amount of the payment.

DePuy attached to its reply some of the emails with Dr. Mullen's office that Plaintiffs produced. 2-ER-181–89. The earliest email was sent on July 1, 2024—the day before the pretrial conference and just a week before trial. 2-ER-181–89. The emails also included two versions of Dr. Mullen's fee schedule. 2-ER-181–89

DePuy said it was "very concerning" that Dr. Mullen's fee schedule had been "revised." 2-ER-157. Dr. Mullen's office first sent a fee schedule to Plaintiffs' counsel on July 2, 2024, at 9:22 am. 2-ER-182. The fee schedule did not have a line item for trial testimony. 2-ER-184. At 4:31 pm the same day, Dr. Mullen's office sent an email stating: "Here is the correct fee schedule. I sincerely apologize for the

21

inconvenience." 2-ER-186. The email attached a fee schedule that included a line item for "in person testimony." 2-ER-189.

The district court heard argument on DePuy's motion. 1-ER-39–53. DePuy argued that Plaintiffs had engaged in a "pattern of deception" because (1) Plaintiffs did not supplement their response to the request for production of "communications" with Dr. Mullen, (2) Plaintiffs' counsel said "No one is paying him for his testimony," (3) Plaintiffs' counsel said that any communications with Dr. Mullen were about scheduling, and (4) there was purportedly a "ginned up fee schedule just for this case" because Dr. Mullen's original fee schedule did not have a line item for trial testimony. 1-ER-41–42.

Notably, DePuy stated: "the prejudice goes all the way back to the deposition, because it turns out now we've learned that before this deposition Dr. Mullen was paid $500 for a five-minute phone call. And that is something that certainly would have been probed at the deposition." 1-ER-40. However, DePuy already knew at the time of the deposition that Dr. Mullen expected payment for the phone call because Dr. Mullen explicitly told DePuy so *at* the deposition. 3-ER-477 (at 14:8–17). The only reason why DePuy did not know the amount of the

22

payment is because DePuy did not ask about the amount at the deposition. *See* 3-ER-477 (at 14:8–17).

In response, Plaintiffs' counsel stated that "[t]here has been no deception" and "[w]e did not try to conceal any payment to Dr. Mullen." 1-ER-43. Counsel noted that all of the communications with Dr. Mullen "were in the past few days." 1-ER-46. Counsel further explained: "it didn't dawn on me that, oh, there was an interrogatory that was asked about a year-and-a-half ago, I have to see if this falls in line with an interrogatory that was asked a year-and-a-half ago, and I've got to now turn that over to the defense." 1-ER-46.

As for counsel's statement that "No one is paying him for his testimony," counsel explained that the statement was made in the context of Defendant's objection about the scope of Dr. Mullen's testimony:

> The context is key. And the context here is that that statement where I said that Dr. Mullen was not being paid was in response to an argument that we were having the day before about the scope of what Dr. Mullen could testify to.
>
> And [DePuy was] saying that Dr. Mullen could not give the ultimate conclusions that the risks outweigh the benefits because [DePuy] said he was a fact witness. And I said, no, he was not just a fact witness, he's a hybrid, nonretained

23

expert witness. That's the context of that exchange at the time.

1-ER-43–44.

Plaintiffs' counsel next explained that there was no "ginned up" fee schedule. 1-ER-45. As counsel put it: "We wanted him to appear at trial. And his office said you have to pay for his time. We said okay. They . . . sent us a fee schedule. And then shortly after on their own they just sent us another fee schedule. And that was it." 1-ER-45.

Plaintiffs' counsel further explained that Dr. Mullen "was not paid for his testimony" or "to look at material and to give opinions on it"; rather, he was paid "for his appearance in court." 1-ER-44. The district court said the distinction counsel had made was "disingenuous." 1-ER-46. The court also told Plaintiffs' counsel, "your attempt to tell me you didn't say what you said only makes this worse." 1-ER-52. The court then chastised counsel for not "tak[ing] responsibility." *See* 1-ER-53.

Ultimately, the court faulted Plaintiffs for not disclosing Dr. Mullen's compensation—even though Plaintiffs were not required to disclose it. 1-ER-47; 1-ER-52–53. The court also focused on counsel's comment that "No one is paying [Dr. Mullen] for his testimony"—even though the comment was made outside the presence of the jury and

24

thus did not require a curative jury instruction. *See* 1-ER-52–53. The court ruled that it would give a "curative" instruction and potentially sanction Plaintiffs' counsel. 1-ER-53–54.

The court did not enter a written order. It later emailed a draft of the "curative" instruction to the parties. *See* 2-ER-132–33.

On the last day of trial, Plaintiffs asked the court to reconsider giving the "curative" instruction. 1-ER-8–10. The court rejected the request. *See* 1-ER-11–14. It then instructed the jury as follows: "In assessing the veracity of Dr. Mullen's testimony, the jury should consider that: (1) There was an effort to withhold Dr. Mullen's compensation from Defendant and the jury; and (2) The excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." 1-ER-26.

## H. DePuy capitalizes on the "curative" instruction during closing arguments.

After the district court gave its "curative" instruction, DePuy capitalized on the instruction during closing arguments. 2-ER-97–101. DePuy told the jury that the instruction was "a critical instruction" and "one of the most important ones" the jury had received. 2-ER-98; 2-ER-100. DePuy stressed that it was "an instruction *from the Court* about

25

what you all should do in your role as jurors." 2-ER-98 (emphasis added). And DePuy used the instruction to attack the very essence of Plaintiffs' claims—arguing that "[w]hen you come in here and you accuse a company of not being truthful with doctors, of withholding information, of trying to hurt patients, and then the instruction we get is about your own effort to keep from the jury excessive payment information, that tells you a lot about what's going on in this case." 2-ER-100–01.

DePuy also used the court's instruction to argue that Dr. Mullen lied about his knowledge of metallosis. Specifically, Dr. Mullen testified that he did not warn Mr. King about metallosis when he implanted DePuy's metal-on-metal hip into Mr. King because he "didn't know that metallosis was a thing back then." 3-ER-278–79. In closing, DePuy argued that Dr. Mullen lied about his knowledge of metallosis because he "was being paid." 2-ER-101. DePuy also acknowledged that Dr. Mullen's testimony was "critical" to Plaintiffs' failure-to-warn claim. 2-ER-102.

26

## I. The jury returns a verdict for DePuy on all counts.

The jury returned a verdict for DePuy on all counts. 2-ER-78. The clerk then entered final judgment against Plaintiffs, from which Plaintiffs appealed. 1-ER-2; 2-ER-74.

## J. The district court sanctions Plaintiffs' counsel.

After trial, the district court ordered Plaintiffs' counsel to show cause why he should not be sanctioned. 2-ER-76. The court noted that the Arizona Rules of Professional Conduct "prohibit a lawyer from knowingly making a false statement of fact to a tribunal." 2-ER-76–77.

Plaintiffs' counsel filed a memorandum in response. 2-ER-67. He reiterated that "[h]is comment that Dr. Mullen was not being paid for his testimony was to emphasize the difference between a treating physician (who does not have to generate written reports) and retained experts." 2-ER-70. He also noted that the statement "was made against the backdrop that retained experts are not just paid for their time but are also paid to review records, perform a literature search, review company internal documents, and provide opinions," whereas non-retained treating physicians are not. 2-ER-70.

Plaintiffs' counsel attached a declaration signed by Dr. Mullen. 2-ER-65. Dr. Mullen explained that he "determined the amount of [his] in-person testimony fee after [he] consulted with other surgeons." 2-ER-66. He also explained that "[n]o one from [Plaintiffs' counsel's] firm conferred with [him] or anyone from [his] office about [his] in-person testimony fee." 2-ER-66.

The district court found that Plaintiffs' counsel "agreed to payment outside the realm of what is reasonable and then failed to disclose that very important information." 2-ER-63. The court did not cite a basis for counsel's purported duty to disclose. 2-ER-63. The court also did not find that counsel knowingly misled the court. 2-ER-63.

The court imposed "a sanction of the attorney's fees that [DePuy] had to pay in dealing with the misrepresentation." 2-ER-63. The court has not yet decided the amount. DePuy has requested $45,187.60 in fees—more than three times the payment to Dr. Mullen. 2-ER-58.

## SUMMARY OF ARGUMENT

The district court instructed the jury: "In assessing the veracity of Dr. Mullen's testimony, the jury should consider that: (1) There was an effort to withhold Dr. Mullen's compensation from Defendant and the jury; and (2) The excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." 1-ER-26. This Court should reverse for three reasons.

***First***, the district court erred by telling the jury "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury." The instruction was not authorized under the rules of procedure or the court's inherent powers. Even if the instruction were authorized, there was not an effort to withhold Dr. Mullen's compensation.

***Second***, the court erred by telling the jury that "[t]he excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." As a matter of law, the payments were not "undisclosed," and it was for the jury to decide if they were "excessive." In any event, as a matter of fact, the payments were not excessive. The court also abused its discretion by singling out Dr. Mullen.

***Third***, DePuy cannot prove harmless error.

29

## STANDARDS OF REVIEW

The arguments in sections I.A.1, I.A.2., I.B.1, and II.A concern questions of law. This Court reviews questions of law de novo. *Gregory v. Montana*, 118 F.4th 1069, 1077 (9th Cir. 2024).

The arguments in section I.B.2 and II.B concern the district court's finding of fact. This Court reviews those findings "for clear error." *Jones v. Riot Hospitality Group LLC*, 95 F.4th 730, 734 (9th Cir. 2024).

The argument in section II.C. concerns the district court's formulation of the curative instruction, which this Court reviews for abuse of discretion. *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 897 (9th Cir. 2024).

The issue is preserved. Plaintiffs opposed DePuy's request for a "curative" instruction. 1-ER-39–53; 2-ER-190–98. And the district court orally ruled that it would give a "curative instruction." 1-ER-53. Plaintiffs also asked the court to reconsider its ruling, which the court denied. 1-ER-8–14.

30

# ARGUMENT

## I. The district court erred by instructing the jury that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury."

The district court instructed the jury that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury." 1-ER-26. This Court should reverse because, as a matter of law, the instruction was not authorized. *Infra* § I.A. Even if the instruction were authorized, this Court should still reverse because there was not an effort to withhold Dr. Mullen's compensation. *Infra* § I.B.

### A. As a matter of law, the instruction was not authorized.

The district court did not enter a written order and did not cite any authority for giving a jury instruction. 1-ER-52–54. The instruction was not authorized under the rules of procedure. *Infra* § I.A.1. The instruction was also not authorized under the court's inherent powers. *Infra* § I.A.2.

#### 1. The instruction was not authorized under the rules of procedure.

Federal Rule of Civil Procedure 37 authorizes sanctions for discovery violations. None of its provisions authorized the district

31

court's jury instruction that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury."

**First**, rule 37(a) concerns motions to compel. DePuy never moved to compel disclosure of Dr. Mullen's compensation, so rule 37(a) is inapplicable. In any event, the only sanction authorized under rule 37(a) is payment of "the movant's reasonable expenses incurred in making the motion"—not a jury instruction. Fed. R. Civ. P. 37(a)(5)(A).

**Second**, rule 37(b) concerns failure to comply with a discovery order. Plaintiffs did not fail to comply with any discovery order. Indeed, neither the district court nor DePuy identified any order that was disobeyed. Accordingly, sanctions under rule 37(b) were unauthorized. *E.g., Unigard Sec. Ins. v. Lakewood Eng'g Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992) ("Rule 37(b)(2)'s requirement that there be some form of court order that has been disobeyed has not been read out of existence; Rule 37(b)(2) has never been read to authorize sanctions for more general discovery abuse.").

**Third**, rule 37(c)(1) authorizes a court to sanction a party if the party "fails to provide information or identify a witness as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1). The rule states that a court

"may inform the jury of the party's failure." Fed. R. Civ. P. 37(c)(1)(B). Here, however, Plaintiffs did not fail to provide information or identify a witness as required by rule 26(a) or (e).

Rule 26(a) requires mandatory disclosures, including expert disclosures. The rule distinguishes between two types of experts: (i) an expert "retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony"—i.e., a retained expert; and (ii) all other experts—i.e., non-retained experts. Fed. R. Civ. P. 26(a)(2)(B)–(C).

For retained experts, the rule specifically requires a party to disclose the expert's written report, including "a statement of the compensation to be paid for the study and testimony in the case." Fed. R. Civ. P. 26(a)(2)(B)(vi). There is no such requirement for non-retained experts. Instead, for a non-retained expert, a party must merely disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).

Plaintiffs disclosed Dr. Mullen as a non-retained expert. 2-ER-210. Thus, Plaintiffs were not required under rule 26(a) to provide a written

33

report for Dr. Mullen or disclose his compensation. As this Court has held, a treating physician "is not subject to the written report requirement" unless he testifies about opinions formed outside the course of treatment. *Goodman v. Staples the Office Superstore, LLC*, 644 F.3d 817, 824–26 (9th Cir. 2011)). Dr. Mullen did not offer opinions formed outside the course of treatment. To the contrary, DePuy objected to Dr. Mullen giving such testimony, and the district court sustained the objections. 3-ER-245–49; 3-ER-268; 3-ER-298–99; 3-ER-370–71.

To hold that Plaintiffs were required under rule 26(a) to disclose Dr. Mullen's compensation would amount to reading words into the rule that are not there. The plain text of the rule requires only that compensation be disclosed for retained experts. Fed. R. Civ. P. 26(a)(2)(B)–(C). A court cannot read words into the rule and impose a disclosure requirement not found in the text. *E.g.*, *United States v. Watkins*, 278 F.3d 961, 965 (9th Cir. 2002) ("[A] court should not read words into a statute that are not there."); *Hillis v. Heineman*, 626 F.3d 1014, 1017 (9th Cir. 2010) ("Only the most compelling of reasons will persuade us to imply an exception where the statutory text does not

34

supply one. This same principle of statutory construction applies to interpreting the Federal Rules of Civil Procedure.").

To hold otherwise would also create a double standard. DePuy and the district court treated Dr. Mullen as a non-retained expert when it came to excluding his opinion testimony. 3-ER-245–249; 3-ER-268; 3-ER-298–99; 3-ER-370–71. Yet, they seemed to treat him as a retained expert when it came to a duty to disclose his compensation. They cannot have it both ways.

In sum, because Dr. Mullen was a non-retained expert, Plaintiffs were not required under rule 26(a) to disclose Dr. Mullen's compensation.

Plaintiffs were also not required under rule 26(e) to disclose Dr. Mullen's compensation. Rule 26(e) states that "[a] party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response." Fed. R. Civ. P. 26(e)(1). Supplementation is required "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information

35

has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A).

As explained above, Plaintiffs were not required to disclose Dr. Mullen's compensation in their rule 26(a) disclosure. Accordingly, the rule 26(a) disclosure was not "incomplete or incorrect," and Plaintiffs were not required to supplement it under rule 26(e). *E.g.*, *Star Direct Telecom, Inc. v. Global Crossing Bandwidth, Inc.*, 272 F.R.D. 350, 357–58 (W.D.N.Y. 2011) ("Where a party was not required to make a disclosure, . . . no supplementation is required.").

DePuy never served any discovery requests for Dr. Mullen's compensation, and it never asked Dr. Mullen during his deposition about the amount of his compensation—even though he testified that he expected to be paid. 3-ER-477 (at 14:8–17). Accordingly, Plaintiffs were not required under rule 26(e) to supplement their discovery responses with Dr. Mullen's compensation. *E.g.*, *Bowers v. NCAA*, 475 F.3d 524, 540 (3d Cir. 2007) ("The duty of supplementation under Rule 26(e) does not require that a party volunteer information that was not encompassed within the scope of an earlier discovery request." (cleaned up)); 8A Charles A. Wright et al., *Federal Practice and Procedure*

36

§ 2049.1 (3d ed. June 2024 update) ("[T]he rule only requires further disclosure if the original response was incomplete or incorrect 'in some material respect,' emphasizing the need to verify that the information was in fact requested and to guard against undue precision in scrutinizing further disclosures.").

The only discovery request that DePuy identified below was its request for production of "[a]ny and all copies of all forms of *communication* between Plaintiff and/or Plaintiff's attorney(s) and Plaintiff's orthopaedic surgeons." 2-ER-149; 2-ER-176 (emphasis added). The term "communication" means "[t]he interchange of messages or ideas by speech, writing, gestures, or conduct; the process of bringing an idea to another's perception." *Black's Law Dictionary*, *Communication* (12th ed. 2024). An ordinary person would not understand payments to be a "communication." *See In Re Crim. Investigation No. 1/296X*, 646 A. 2d 389, 392 (Md. Ct. App. 1994) ("[P]ayment of a fee is a nonassertive act that is not intended to communicate information."). Plaintiffs therefore had no duty to disclose Dr. Mullen's compensation in response to DePuy's request for production.

37

This understanding is consistent with the fact that—until trial—DePuy never moved to compel disclosure of Dr. Mullen's compensation. When DePuy served the request for production in early November 2022, DePuy *should have known* that it is customary for litigants to pay treating physicians to appear at trial.[4] After Dr. Mullen's deposition in mid-November 2022, DePuy *actually knew* that Dr. Mullen expected to be paid. 3-ER-477 (at 14:8–13). If DePuy truly understood its November 2022 request for "communications" to include payments to Dr. Mullen, then it would have—and should have—moved to compel Plaintiffs to produce evidence of such payments long before the July 2024 trial.

---

[4] *See* Michael L. Forte & Sara M. Klco, *Must Treating Physicians Be Paid for Their Testimony?*, 32 Trial Advoc. Q. 25, 25 (2013) ("In personal injury cases, the plaintiff's treating physicians generally charge a fee for their testimony."); *Lamere v. N.Y. State Office for the Aging*, 223 F.R.D. 85, 92 n.8 (N.D.N.Y. 2004) (noting the "practice to compensate a treating physician for his time whether at the deposition or at trial by providing a reasonable fee"); *Hall v. Sykes*, 164 F.R.D. 46, 48 (E.D. Va. 1995) ("It is traditional that doctors are compensated for their time when required to testify."); *Haslett v. Tex. Indus., Inc.*, No. 397–CV–2901D, 1999 WL 354227, at *2 (N.D. Tex. May 20, 1999) ("It is customary in this district and in area state courts for parties to compensate physicians at a reasonable rate for giving depositions in cases in which they are not parties."); American Medical Association, *AMA-ABA Statement on Interprofessional Relations for Physicians and Attorneys* H-265.977 (2018), https://tinyurl.com/27faf6c6 ("The physician is entitled to reasonable compensation for . . . court or other appearances.").

In sum, Plaintiffs were not required to disclose Dr. Mullen's compensation under rule 26(a) or (e). Sanctions under rule 37(c)(1) were therefore unauthorized. *E.g., Liberty Ins. Corp. v. Brodeur*, 41 F. 4th 1185, 1190–91 (9th Cir. 2022) (holding that sanctions under rule 37(c)(1) were unauthorized because the sanctioned parties complied with rule 26(a)'s disclosure requirements).

***Fourth***, rule 37(d) authorizes sanctions if a deponent fails to appear for a deposition or "a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written response." Fed. R. Civ. P. 37(d)(1)(A)(i)–(ii). Plaintiffs and Dr. Mullen did not fail to appear for a deposition, and Plaintiffs did not fail to serve a written response to DePuy's request for production, so rule 37(d) is inapplicable. In any event, rule 37(d) limits the sanctions that may be awarded to those "listed in Rule 37(b)(2)(A)(i)–(vi)." Fed. R. Civ. P. 37(d)(3). That list does not include jury instructions. Fed. R. Civ. P. 37(b)(2)(A)(i)–(vi).

***Fifth***, rule 37(e) concerns spoliation of electronically stored information. Plaintiffs did not spoliate any electronically stored information. Accordingly, rule 37(e) is inapplicable.

39

*Finally*, rule 37(f) authorizes a court to sanction a party if it "fails to participate in good faith in developing and submitting a proposed discovery plan as required by Rule 26(f)." Plaintiffs did not fail to do so, so rule 37(f) is inapplicable.

In sum, rule 37 sets forth sanctions for various discovery violations. Yet, none of its provisions authorized the district court's jury instruction that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury." The district court therefore had no authority to give the instruction under rule 37. *Unigard*, 982 F.2d at 368 ("This court . . . has foreclosed the application of Rule 37 sanctions in cases such as this where a party's alleged discovery-related misconduct is not encompassed by the language of the rule.").

### 2. The instruction was not authorized under the district court's inherent powers.

In addition to the rules of procedure, courts also have inherent powers to issue sanctions. Here, however, the district court's instruction that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury" was not authorized under the court's inherent powers.

40

***First***, district courts have the inherent power to give curative jury instructions—i.e., instructions to "cure the effects of improper comments" made in front of the jury at trial. *See United States v. Randall*, 162 F.3d 557, 559 (9th Cir. 1998). Here, counsel's comment that "[n]o one is paying [Dr. Mullen] for his testimony" was made *outside the presence of the jury*. 3-ER-233; 3-ER-247; 3-ER-249. Thus, there was nothing to cure, and an instruction was unauthorized. *See Baldwin v. Sec'y, Fla. Dep't of Corrs.*, No. 16–17101–B, 2017 WL 5665448, at *4 (11th Cir. 2017) (unpublished) ("[A]ll of the discussion regarding the removal of the juror occurred outside the presence of the jury. Therefore, counsel had no reason to request a curative instruction.").

***Second***, district courts have the inherent power "to discipline attorneys who practice before them." *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir. 1995). Yet, the court's inherent powers did not authorize it to give a jury instruction as a sanction for counsel's comment. After all, it was counsel—not Plaintiffs—who made the comment. To the extent counsel violated any ethical rules, the sanction would be directed to counsel. *Miranda v. S. Pac. Transp. Co.*, 710 F.2d

41

516, 521 (9th Cir. 1983) ("[S]anctions such as these are directed at the lawyers responsible, rather than the litigants."); *Davis v. Miller*, 571 F.3d 1058, 1061 (10th Cir. 2009) ("If the fault lies with the attorneys, that is where the impact of sanction should be lodged." (citation omitted)). Indeed, the district court later sanctioned counsel by ordering him to pay "the attorney's fees that [DePuy] had to pay in dealing with the misrepresentation." 2-ER-62.

**Third**, district courts have the inherent power to "sanction for conduct which abuses the judicial process." *Am. United for Kids v. Rousseau*, 985 F.3d 1075, 1088 (9th Cir. 2021) (citation omitted). Yet, "[w]hen acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith." *Id.* at 1090.

Here, Plaintiffs did not violate any court order. And Plaintiffs did not engage in bad faith, nor did the court find as much. The lack of such an "explicit finding" precludes sanctions under the district court's inherent power. *Id.* ("[B]ecause a district court's inherent powers are so potent, we require that when a court imposes sanctions based on bad faith, the court must make an *explicit finding* that the sanctioned

42

party's conduct 'constituted or was tantamount to bad faith.'" (citation omitted) (emphasis added)); *accord Env'l World Watch v. Walt Disney*, 630 F. App'x 687, 690 (9th Cir. 2015) (unpublished) ("We also cannot affirm Becvar's sanction as a valid exercise of the district court's inherent powers, because the magistrate judge and the district court made no explicit finding that Becvar's actions constituted or were tantamount to bad faith.").

It makes sense that a court cannot use its inherent powers to instruct a jury about a mere nondisclosure in the course of discovery. Parties routinely object to requested discovery or misconstrue what discovery is requested. Discovery disputes have no bearing on the evidence presented to a jury at trial, so the jury should not be instructed about those disputes.

A hypothetical illustrates the point. Suppose that Plaintiffs requested DePuy to produce a document. DePuy makes a good-faith objection, but the court overrules the objection, and the document is produced. The document turns out to be a "smoking gun." Can the district court instruct the jury that there was an "effort to withhold" the crucial evidence because DePuy objected to its discovery?

43

The answer should be clear: no. If courts were to instruct the jury every time a party misconstrued or unsuccessfully objected to a discovery request, then there would be endless minitrials about collateral discovery issues.

It is not within the jury's province to determine whether Plaintiffs "made an effort to withhold Dr. Mullen's compensation from Defendant and the jury." The trial was about the products-liability claims, not about possible discovery violations or counsel's representations to the court. Discovery violations are adjudicated before trial by a magistrate judge or district court as a finder of fact—not by a jury. Counsel's untruthful statements to a court are adjudicated, as matter of fact and law, by a disciplinary tribunal—not a jury.

In sum, the district court's inherent powers did not authorize the court to instruct the jury that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury."

## B.  There was not an effort to withhold Dr. Mullen's compensation.

Even if the court's instruction were authorized, this Court should still reverse because there was not "an effort to withhold Dr. Mullen's compensation." The court's instruction seemed to rest on two premises:

44

(1) Plaintiffs did not disclose Dr. Mullen's compensation, and

(2) Plaintiffs' counsel said: "No one is paying [Dr. Mullen] for his testimony." *See* 1-ER-47; 1-ER-52–53. Neither premise supports the court's instruction. As a matter of law, Plaintiffs did not have a duty to disclose Dr. Mullen's compensation. As a matter of fact, counsel's comment was not an effort to withhold Dr. Mullen's compensation.

### 1. As a matter of law, Plaintiffs did not have a duty to disclose Dr. Mullen's compensation.

The district court and DePuy faulted Plaintiffs for not disclosing Dr. Mullen's compensation. 1-ER-47; 1-ER-52–53; 3-ER-384. This fault was unwarranted because Plaintiffs did not have a duty to disclose Dr. Mullen's compensation.

Under the common law, a civil litigant had no duty to disclose information to its opponent. III John Henry Wigmore, *A Treatise on the Anglo-American System of Evidence in Trials at Common Law* § 1845, at 922 (2d ed. 1923) (explaining that the common law "declined to require notice at all"). Our common-law system is an adversarial one, "originating in a community of sports." *See id.* at 923–24. "To require the disclosure to an adversary of the evidence that is to be produced, would be repugnant to all sportsmanlike instincts." *Id.* at 924.

45

Accordingly, "a civil litigant has no independent obligation to volunteer information to its opponent." *Apotex Corp. v. Merck & Co.*, 229 F.R.D. 142, 148 (N.D. Ill. 2005).

Not only does a civil litigant have no independent obligation to volunteer information to its opponent, but a lawyer also has an ethical duty to *not* volunteer information unless doing so is in his client's best interests. "As advocate, a lawyer zealously asserts the client's position under the rules of the adversary system." ABA, *Model Rules of Professional Conduct,* preamble, https://tinyurl.com/22f7zrnr. The lawyer's duties of loyalty "prohibit the lawyer from harming the client." Restatement (Third) of the Law Governing Lawyers § 16 cmt. c. (2000). Unless required by law, it would be unethical for a lawyer to disclose information that is harmful to his client. *See generally id.* §§ 60–61.

Of course, a duty to disclose can arise from the Federal Rules of Civil Procedure. For example, rule 26(a)(2) imposes initial disclosure requirements for expert witnesses. Yet, as explained *supra* § I.A.1, Plaintiffs disclosed Dr. Mullen as a non-retained expert, so they had no duty under rule 26 to disclose Dr. Mullen's compensation.

46

A duty to disclose can also arise from a discovery request under the rules of procedure. But the only discovery request that DePuy relied on below was its request for production of "[a]ny and all copies of all forms of *communication* between Plaintiff and/or Plaintiff's attorney(s) and Plaintiff's orthopaedic surgeons." 2-ER-149; 2-ER-176 (emphasis added). As explained *supra* § I.A.1, Plaintiffs did not have a duty to disclose Dr. Mullen's compensation in response to this request for production.

To be sure, on the eve of trial, there were emails exchanged between Plaintiffs' counsel and Dr. Mullen's office. 2-ER-181–89. Those emails were communications. But the court did not instruct the jury that "there was an effort to withhold *emails*"—rather, it told the jury "there was an effort to withhold *Dr. Mullen's compensation.*" 1-ER-26 (emphasis added).

What's more, Plaintiffs' counsel explained that the emails were sent in the days before trial, and it did not dawn on him that the emails might be responsive to one of the 57 requests for production that DePuy had served more than a year and a half before. *See* 1-ER-46. Indeed, every lawyer who tries a case directly or indirectly contacts witnesses

47

by email and other forms of communication in the week before a trial. Nevertheless, Plaintiffs' research has not located a single case where a trial lawyer was sanctioned for failing to disclose the lawyer's communications with witnesses during the week before a trial. The fact that Plaintiffs did not supplement their discovery response with the emails exchanged with Dr. Mullen the week before trial does not amount to "an effort to withhold Dr. Mullen's compensation."

"Rule 26 does not mandate when the duty to supplement ends." *Watson v. City of Henderson*, No. 2:20-cv-01761, 2024 WL 1514983, at *7 (D. Nev. Apr. 5, 2024). However, "[t]he duty to supplement under Rule 26(e)(1) is directed to documents generated *during the relevant time frame* previously not produced but subsequently discovered." *Id.* "To say that the duty to supplement covers documents generated after that date would render meaningless any delineated time period for production. Nothing in rule 26(e)(1) imposes a never-ending obligation to produce documents continuously as they are created." *Id.* (cleaned up). Here, the earliest email between Plaintiffs' counsel and Dr. Mullen's office was not sent until July 1, 2024—the day before the pretrial conference and just a week before trial. *See* 2-ER-181–89.

48

In sum, Plaintiffs did not have a duty to disclose Dr. Mullen's compensation. The court therefore erred as a matter of law in relying on Plaintiffs' lack of disclosure as basis for instructing the jury that "[t]here was an effort to withhold Dr. Mullen's compensation from Defendant and the jury."

### 2. As a matter of fact, counsel's comment was not an effort to withhold Dr. Mullen's compensation.

In addition to the lack of disclosure, the district court also focused on Plaintiffs' counsel's comment that "No one is paying [Dr. Mullen] for his testimony." *See* 1-ER-52–53. As a matter of fact, counsel's comment was not an effort to withhold Dr. Mullen's compensation.

"As is so often true with language, context is crucial." *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 734 n.17 (9th Cir. 2017). The context for counsel's comment was that DePuy had raised an objection concerning Dr. Mullen's deposition testimony that the risks of metal-on-metal implants outweigh the benefits. 3-ER-245. DePuy argued that "that is *improper undisclosed expert testimony* for a fact witness who is coming in here to talk about his implantation of this device in 2010." 3-ER-245 (emphasis added). Although DePuy did not object to Dr. Mullen testifying about the opinions he held in 2010, it

49

objected to "any attempt to solicit *undisclosed expert testimony* about how he viewed that risk/benefit analysis later on down the road." 3-ER-245–46 (emphasis added).

Plaintiffs disagreed that it was an undisclosed expert opinion and distinguished between retained experts and non-retained treating physicians. 3-ER-246–47. In doing so, Plaintiffs' counsel said: "Dr. Mullen is a treating physician. Treating physicians are hybrid experts. They're nonretained. No one is paying him for his testimony. He's not a retained expert witness. He's a nonretained expert witness." 3-ER-247.

As reflected above, counsel's comment was made in response to DePuy's objection and to distinguish between retained experts and non-retained treating physicians—not as an "effort to withhold Dr. Mullen's compensation." Indeed, counsel wanted to provide *more* evidence to the jury in the form of Dr. Mullen's opinions about metal-on-metal implants—not *withhold* evidence from the jury.

In sum, as a matter of fact, counsel's comment was not an effort to withhold Dr. Mullen's compensation. The district court clearly erred in finding otherwise.

50

**II.    The district court erred by instructing the jury that "[t]he excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony."**

The district court instructed the jury that "[t]he excessive and undisclosed payments to Dr. Mullen may have affected the credibility of his testimony." 1-ER-26. This Court should reverse because, as a matter of law, the payments were not "undisclosed," and it was for the jury to decide if they were "excessive." What's more, as a matter of fact, the payments were not "excessive." Finally, the court abused its discretion by singling out Dr. Mullen.

**A.    As a matter of law, the payments to Dr. Mullen were not "undisclosed," and it was for the jury to decide if they were "excessive."**

The district court told the jury that the payments to Dr. Mullen were "excessive and undisclosed." 1-ER-26. The court erred as a matter of law because the payments were not "undisclosed," and it was for the jury to decide if they were "excessive."

***First***, "saying in a jury trial that something is 'undisclosed' . . . suggests strongly the existence of a duty to disclose." *United States v. Biddix*, No. 8:14-cr-140, 2015 WL 9473949, at *2 (M.D. Fla. Dec. 29, 2015). Absent a duty to disclose, the term "undisclosed" is "confusing

51

and misleading." *Id.* As argued *supra* § I.B.1., Plaintiffs did not have a duty to disclose Dr. Mullen's compensation. The court therefore erred as a matter of law by instructing the jury that the payments were "undisclosed."

**Second**, it was for the jury—not the court—to decide whether the payments to Dr. Mullen were "excessive." The payments were relevant to the jury because they pertained to Dr. Mullen's credibility. *See Jewell v. Life Ins. of N. Am.*, 508 F.3d 1303, 1312 (10th Cir. 2007) (noting that "the size of an expert's fee . . . may be relevant to his credibility). The payments did not pertain to any other issue before the jury.

"Assessing expert witness credibility is within the province of the jury." *S.E.C. v. Todd*, 642 F.3d 1207, 1217 (9th Cir. 2011). In other words, "[t]he credibility of experts is to be determined by the jury, not by the court." *United States v. Handy*, 454 F.2d 885, 888 (9th Cir. 1971). Indeed, one of this Court's model instructions tells the jury that it "may have to *decide* which testimony to believe and which testimony not to believe." Ninth Circuit Model Civil Jury Instruction 1.14 (emphasis added). Accordingly, the underlying question of fact—whether the payments were "excessive"—was for the jury to decide.

52

Both at the start and the end of trial, the district court gave Ninth Circuit Model Civil Jury Instruction 1.14, telling the jury that it could consider "the witness's interest in the outcome of the case," "the witness's bias or prejudice," and "any other factors that bear on believability." 1-ER-25–26; 3-ER-380–82. The model instruction was sufficient to inform the jury about its responsibility to assess the credibility of witnesses.

Although "[t]rial courts have broad discretion to comment upon the evidence, including the credibility of a witness," the court must "ma[k]e clear to the jury that all matters of fact are for its determination." *Navellier v. Sletten*, 262 F.3d 923, 943 (9th Cir. 2001). This is because "the influence of the trial judge on the jury is necessarily and properly of great weight and his lightest word or intimation is received with deference, and may prove controlling." *Quercia v. United States*, 289 U.S. 466, 470 (1933) (cleaned up).

Here, the district court did not couch its instruction as a comment on the evidence that the jury could reject. The court simply instructed the jury that the payments to Dr. Mullen were "excessive." 1-ER-26.

53

The court made a "definite and concrete assertion of fact, . . . made with all the persuasiveness of judicial utterance." *Quercia*, 289 U.S. at 472.

In sum, as a matter of law, the payments to Dr. Mullen were not "undisclosed," and it was for the jury to decide if they were "excessive." The district court therefore erred by instructing the jury that the payments were "excessive and undisclosed." 1-ER-26.

## B. As a matter of fact, the payments to Dr. Mullen were not "excessive."

Even if the district court could properly instruct the jury that the payments to Dr. Mullen were "excessive," the court's instruction was wrong as a matter of fact.

To begin, DePuy conceded below that "lawyers may . . . compensate a non-retained expert or fact witness for (1) reasonable expenses incurred by the witness to attend the trial, and (2) reasonable compensation for *the loss of the witness's time* in attending trial to testify." 3-ER-385 (emphasis added). As DePuy noted, "Congress codified this common law principle at 18 U.S.C. § 201," which permits payment to witnesses for "reasonable cost of travel and subsistence incurred and *the reasonable value of time lost* in attendance at any such trial, hearing, or proceeding." 3-ER-385 (emphasis added). "Although

54

the federal courts have reached varying conclusions as to the circumstances in which payments to a fact witness will be deemed improper, they are generally in agreement that a witness may properly receive payment related to the witness' expenses and reimbursement for *time lost* associated with the litigation." *Prasad v. MML Invs. Servs., Inc.*, No. 04 Civ. 380, 2004 WL 1151735, at *5 (S.D.N.Y. May 24, 2004) (collecting cases) (emphasis added).

"Physicians provide invaluable services to the public and should be remunerated for their time when they cannot deliver medical care." *Haslett v. Tex. Indus., Inc.*, No. 397–CV–2901D, 1999 WL 354227, at *2 (N.D. Tex. May 20, 1999). "They often have substantial overhead costs that they incur whether they are creating a patient or testifying about one." *Id.* "Litigators and their clients . . . respect the need to compensate physician-witnesses to the extent necessary to cover their overhead costs and to pay them a fee commensurate with their professional standing and special expertise." *Id.*[5]

---

[5] In *Haslett*, the court noted there was "no record evidence that [the treating rheumatologist's] proposed fees of $10,000 per day for a full or partial day of trial testimony, $650 per hour for weekend deposition testimony, or $1,000 per hour for weekday deposition testimony are reasonable." 1999 WL 354227 at *2. Here, we do have record evidence:

There are several "objective ways of determining whether payments are reasonable: (1) the witness' current rate of pay if currently employed; (2) what the witness last earned if not currently employed; and (3) what others earn for comparable activity." Jeffrey S. Kinsler & Gary S. Colton, Jr., *Compensating Fact Witnesses*, 184 F.R.D. 425, 431 (1999).

Here, Dr. Mullen testified that he is one of the busiest orthopedic surgeons in his region. *See* 3-ER-257. Appearing in court requires him to cancel surgeries and patient consults. 3-ER-364. Indeed, he had to "cancel 18 patients" and reschedule their appointments to testify at Plaintiffs' trial. 3-ER-364. He said "[t]here is a lot of lost faith with patients when you have to cancel on short notice like this" and that "it makes a bit of a mess of the schedule and other people's lives." 3-ER-364.

Plaintiffs paid Dr. Mullen a flat fee of $15,000 to appear at trial. Doc. 3-ER-360–61. Dr. Mullen's fee was commensurate with the fee charged by DePuy's expert orthopedic surgeon, Dr. Barrington, who

---

Dr. Mullen's testimony and the evidence of Dr. Barrington's compensation. *Infra* at pp. 56–57.

charged $12,125.00 a day to testify at trial. 2-ER-197; 2-ER-219. Accordingly, the court clearly erred in finding that the payments to Dr. Mullen were "excessive."

### C. The district court abused its discretion by singling out Dr. Mullen.

The jury had already been instructed about the credibility of witnesses in general. Both at the start and the end of trial, the court gave Ninth Circuit Model Civil Jury Instruction 1.14, telling the jury that it could consider "the witness's interest in the outcome of the case," "the witness's bias or prejudice," and "any other factors that bear on believability." 1-ER-25–26; 3-ER-380–82.

It was an abuse of discretion for the court to single out Dr. Mullen and tell the jury that the payments to him may have affected his credibility. Although "[t]rial courts have broad discretion to comment upon the evidence, including the credibility of a witness," the court must "ma[k]e clear to the jury that all matters of fact are for its determination." *Navellier*, 262 F.3d at 942. Here, the court did not make clear that it was for the jury to evaluate Dr. Mullen's credibility.

To be clear, Plaintiffs are not arguing that the jury could not consider Dr. Mullen's compensation in assessing his credibility. A

57

witness's compensation is certainly a "factor that bear[s] on believability," so the jury could properly consider Dr. Mullen's compensation. Ninth Circuit Model Civil Jury Instruction 1.14.

Nor are Plaintiffs arguing that the district court could not instruct the jury that—in general—the jury could consider a witness's compensation in evaluating the witness's credibility. In addition to giving Ninth Circuit Model Jury Instruction 1.14, the court certainly could have told the jury that it could consider "the witness's compensation."

But the district court did not give such a general instruction. Instead, it instructed the jury that "[t]he excessive and undisclosed payments *to Dr. Mullen* may have affected the credibility of his testimony." 1-ER-26 (emphasis added). The court abused its discretion by drawing particular attention to Dr. Mullen and singling him out from every other witness, many of whom were also compensated.

This Court's decision in *Maheu v. Hughes Tool Co.*, 569 F.2d 459 (9th Cir. 1977), is instructive. There, the trial judge commented on the credibility of the plaintiff. *Id.* at 469. This Court reversed and remanded for a new trial because the comments "went too far." *Id.* at 471. Even

58

though—unlike here—the trial judge "did tell the jurors that they were free to disregard his comments on the evidence," this Court said "that was not sufficient to cure the error." *Id.* at 473. This Court explained that "[t]he impact of the comment is not so easily mitigated" and that "[t]he timing of the comment immediately before the jury retired to deliberate further assured it a strong impact." *Id.* at 472.

Here, too, the district court's instruction went too far. Granted, the court used the permissive word "may," telling the jury that "[t]he excessive and undisclosed payments to Dr. Mullen *may* have affected the credibility of his testimony."1-ER-26 (emphasis added). Yet, immediately before, the court told the jury that it "*should* consider that . . . [t]here was an effort to withhold Dr. Mullen's compensation from defendant and the jury." 1-ER-26 (emphasis added). The court also told the jury that the payments to Dr. Mullen were "undisclosed and excessive." 1-ER-26. Viewed as whole, the court's instruction likely coerced the jury into disbelieving Dr. Mullen.

## III. DePuy cannot prove harmless error.

The district court's errors in this case are presumed to be prejudicial. *E.g.*, *Chinaryan v. City of Los Angeles*, 113 F.4th 888, 903

(9th Cir. 2024) ("We presume prejudice where civil trial error is concerned" (cleaned up)). Accordingly, as the beneficiary of the errors, DePuy has the burden to prove harmless error. *Id.* To meet its burden, DePuy must prove that "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Id.* (citation omitted). DePuy cannot meet its burden.

To begin, the court's "curative" instruction was so prejudicial that it was harmful on its own. It is unlikely that a jury will find for a party when the jury is instructed by the court that the party has made an effort to withhold information from the jury. Even more so when the information concerns so-called "excessive" payments to one of the party's star witnesses.

The harm from the court's instruction was not limited to the instruction itself. To make matters worse, DePuy capitalized on the instruction during closing arguments. 2-ER-97–101; *see also United States v. Valencia-Lopez*, 971 F.3d 891, 902 (9th Cir. 2020) (finding no harmless error and noting that "the government emphasized [the erroneously admitted] testimony in its closing").

60

DePuy told the jury that the instruction was "a critical instruction" and "one of the most important ones" the jury had received. 2-ER-98; 2-ER-100. DePuy stressed that it was "an instruction *from the Court* about what you all should do in your role as jurors." 2-ER-98 (emphasis added). And DePuy used the instruction to attack the very essence of Plaintiffs' claims—arguing that "[w]hen you come in here and you accuse a company of not being truthful with doctors, of withholding information, of trying to hurt patients, and then the instruction we get is about your own effort to keep from the jury excessive payment information, that tells you a lot about what's going on in this case." 2-ER-100–01.

DePuy also used the court's instruction to argue that Dr. Mullen lied about his knowledge of metallosis. Specifically, Dr. Mullen testified that he did not warn Mr. King about metallosis when he put the implant into Mr. King's left hip because he "didn't know that metallosis was a thing back then." 3-ER-278–79. In closing, DePuy argued that Dr. Mullen lied about his knowledge of metallosis because he "was being paid." 2-ER-101–03. DePuy also acknowledged that this testimony was "critical" to Plaintiffs' failure-to-warn claim. 2-ER-102.

61

In sum, it is not more probable than not that the jury would have reached the same verdict had the court never given the "curative" instruction." Accordingly, DePuy cannot prove harmless error.

## CONCLUSION

This Court should reverse and remand for a new trial.

CREED & GOWDY, P.A.

/s/ *Dimitrios A. Peteves*
**Dimitrios A. Peteves**
dpeteves@appellate-firm.com

/s/ *Bryan S. Gowdy*
**Bryan S. Gowdy**
bgowdy@appellate-firm.com
filings@appellate-firm.com
865 May Street
Jacksonville, Florida 32204
(904) 350-0075

*Counsel for Appellants, Michael King and Deborah King*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 24-5040

I am the attorney or self-represented party.

**This brief contains** 11,650 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

☉ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____ .

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Dimitrios A. Peteves **Date** January 6, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*